(Franklin County Court of Common Pleas.)

WILLIAM H. ALBERY, FRANCIS M. SESSIONS and LEANDER J. CRITCHFIELD, as Trustees and Executors of the last will of FRANCIS C. SESSIONS, deceased, v. MARY J. SESSIONS, FIRST CONGREGATIONAL CHURCH by its Trustees and others.

### "Twin Wills."

1. A joint testamentary contract defined.
2. Part of a will may be upheld, while part may be rejected, where they are not so connected that one must fail if the other fails.
3. A charitable trust, the subject of which is indefinite, cannot be enforced.
4. The rule of *cy pres* cannot be applied to save such a trust.
5. Is the rule *cy pres* in force in Ohio?

(Decided September, 1895.)

---

PUGH, J.

There are two independent controversies in this cause for decision.

The plaintiffs, as trustees and executors, desire and pray for instructions, advice and judgment relative to their powers and duties. They

also ask for other relief in the nature of the specific execution of a contract. That relief, if granted, will redound to the benefit of the contemplated "Sessions Academy of Art."

Mary J. Sessions combats the construction which the plaintiffs place on their powers and duties, and resists their application for the relief which they seek for the benefit of the Academy of Art.

In this controversy the plaintiffs and Mary J. Sessions are the combatants.

The contention of the plaintiffs is, that Francis C. Sessions, in his lifetime, and Mary J. Sessions, his wife, made mutual, "twin," wills; that by these wills they made a testamentary compact or contract.

If such a compact was made, and their construction of it is faithful, Francis C. Sessions agreed to, and did, devise and bequeath his homestead and his furniture, piano, bookcase, carpets, books on art, paintings, statuary, and pictures, in the event that his wife, surviving him, should not dispose of them, to the Academy of Art, and Mary J. Sessions agreed to, and did, devise certain of her real estate, designated as the "Sessions Block," the "Johnson Building," Chittenden Place lots and Morrison lot, and also agreed to, and did, bequeath $10,000 in money, to the Academy of Art. Further, the plaintiffs contend that Francis C. Sessions, by his will, gave them power to use, in a certain contingency, such an additional portion of his estate for the benefit of the academy as they, in their judgment, should determine to be necessary; that being, also one of the stipulations of the compact.

The homestead is valued at $53,000; the furniture, carpets, paintings, etc., were not valued. The four parcels of real estate devised by Mrs. Sessions are valued at $318,000. By the will of Sessions a lot was devised to the First Congregational church for a parsonage; his library, except books on art, was bequeathed, after his wife's death, to the city library; about $35,000 was given in pecuniary legacies to divers of his relatives and other persons, and for specific purposes, named in the will; all of his money invested in the banking business of Sessions & Co., aggregating $30,000, after payment of the debts of the firm to the estate, was given to W. H. Albery and Francis M. Sessions, and all of the residue of his estate was devised and bequeathed to the First Congregational church of this city, for purposes therein specified.

Excluding the homestead and the parsonage lot, his real estate is valued at about $42,300; while his personal property, after payment of debts and expenses, and after deducting the specific legacy to W. H. Albery and F. M. Sessions, and pecuniary legacies to relatives, etc., is valued at about $20,000.

By her will Mrs. Sessions gave $40,000 to the Marietta college, $40,000 to the Oberlin college, $40,500 in pecuniary legacies to relative sand others; a tract of 326 acres of land, situated in Nebraska, and a lot in Indiana she gave to relatives; and she made certain societies of the Congregational church of the United States her residuary devisees and legatees.

The claim of the executors is that the execution of each of these wills was a consideration for the execution of the other, and thus a testamentary compact or contract was entered into by and between Mr. and Mrs. Sessions, which could not be rescinded or revoked without the consent of both parties manifested in the lifetime of both; and that, since Mrs. Sessions, after her husband's death, did revoke her will, she should be decreed to specifically execute her contract.

The revocability of ordinary wills by their authors is not controverted, but it is insisted that these are more than wills in the ordinary sense.

The other controversy is waged by the executors and the First Congregational church.

The pretension of the executors is that, even if Mrs. Sessions could legally revoke her will, the homestead of Mr. Sessions, his furniture, piano, carpets, books on art, paintings, pictures and statuary, except such as has fallen to her share under a compromise, and such other portions of his estate as they may deem necessary, under what may be respectfully called the elastic provision of his will, should be dedicated and devoted to the creation and nurture of the Academy of Art, although it may result in the extinguishment of the pecuniary, specific and residuary legacies and devises.

The pretension of the trustees of the church is, that, since the wills were revocable, and Mrs. Sessions has revoked her will, the purpose of Mr. Sessions to establish the Academy of Art has failed, the trust in its favor has lapsed, the academy was "still-born," and, therefore, all of the property which by his will was given to the academy, as well as all of the property not otherwise specifically disposed of, comes to the church as residuary legatee and devisee.

Mrs. Sessions is not interested in this controversy, or in its decision.

The merits of the first controversy will be first determined.

Ancient and modern law declare that mutual wills may be so made by two persons that if either revokes his will, secretly or clandestinely, the other will be entitled to relief in the nature of specific execution, or in damages. To authorize either to exercise the liberty of repenting and recanting his share of the testamentary provisions he must first give the other due notice of his purpose.

But to make mutual wills thus irrevocable, as it were, they must rest upon a mutual agreement, and one must be the condition or consideration for the execution of the other.

It is absolutely essential to be as explicit and clear on this subject as one is able. To render a satisfactory decision—satisfactory at least to the author of it—he must have a definite conception of the rule and its limitations.

In countries where the civil law governs, if two persons execute wills at the same time, each knowing the provisions of the other's will as well as his own, and each giving all of his property, or a specific part of it, to the other, neither testator can disannul his will, in the lifetime of both, without giving notice to the other.

But that never was the rule in the country from which we either inherit, absorb or borrow many of our laws; nor is it the modern law of any of the states of the Union.

In Hobson v. Blackburn, 1 Adams Eq., 274, a mutual will of the character I have described was avowed to be "unknown to the testamentary law of this country," but might be valid "as a compact."

In Day ex parte, 1 Bradford's Reports, 476, this construction was affirmed of that decision:

"So far as this judgment proceeded upon the revocability of a will by a subsequent testamentary paper duly executed, notwithstanding any contract to the contrary, the decision is beyond criticism."

This statement in confirmed by Jarman on Wills (6th American edition), 29, and 1 William's Ex'rs (7th American edition) 9, 174.

When two persons execute wills at the same time, each knowing the contents of both wills, and each devising or bequeathing his estate, or a specific part of it, to a third person, either may disown or revoke his will, at his pleasure, and without giving notice to the other, either in the lifetime of both, or after the death of the other

The concurrent execution of the wills and the knowledge that each had of the contents of both, are not enough to impose an obligation to forbear revocation.

But when two persons enter into a contract or compact by which each agrees that he will bequeath or devise all, or a definite part, of his estate to the other, and in conformity to that contract they execute their wills, then, if either revoke, his will, without first giving notice to the other, the other will be awarded by a court of equity a specific performance of the contract; or, if that be impossible because the property has been conveyed to bona fide purchasers, or for any other reason, he may recover damages for the breach of the contract.

If, however, two persons make a contract by which they agree to bequeath and devise all, or definite portions, of their respective estates, to a third person, and, pursuant to that contract, they concurrently execute their wills, each knowing the contents and provisions of the other's will, but the third person having no knowledge of either, can this third person, in case either or both revoke their wills, compel a specific performance of the contract, or recover damages for its breach?

Since it is the law in Ohio that when one person makes a promise, upon a valid consideration, to another to pay a third person money, the latter may enforce the promise, although it is not made to him in his name, the foregoing question will have to be answered in the affirmative.

This case at bar is one in which the executors of Sessions are trying to enforce an alleged contract made by Mrs. Sessions to give property to an artificial person that was not a party to the contract.

If certain duties were not incumbent upon them as trustees in transferring the property to the academy, in regard to which they are asking for advice, they would have no standing in court

A testamentary contract, now under consideration, has essential elements, which are common to all contracts, and some that are peculiar to testamentary contracts.  Without them it is not valid.

1. The minds of both parties must meet in regard to the same thing.
2.  They must be competent and free to act.
3.  There must be a consideration.  The execution of each of the mutual wills must be the consideration for the execution of the other.
4.  There must be a mutuality.  The mutuality must run through the whole of both wills, and through every part of each will.  A reciprocity must prevade both wills.  "The property of both is put into a common fund, and every devise is the joint devise of both."  So says judicial precept.

Defour v. Peraro, 1 Dicken's Chancery Reports, 419.

5.  The two wills must be concurrently executed.  They could not be twins unless they were executed at the same time, or within a reasonably short time of each other.
6.  Each testator, at the time the wills were executed, or before that time, must have known what were the provisions of both wills.
7.  Both testators must have intended that the wills should not be revoked without the consent of both of them.

The existence and terms of the contract must be established by the most clear and satisfactory evidence.

The same kind of evidence by which other contracts are proved may be used.  They may be proved by matter apparent on the surface of the wills, manifesting an agreement, as by express statements therein, that the wills are made pursuant to an agreement, or by a mutuality of testamentary intention appearing in each will sufficient to show such an agreement, or by extrinsic evidence outside of the wills, disclosing the terms of the contract.

Edson v. Parsons, 32 N. Y. Supp. 1036.

Has it been proved in this case that the wills of Mr. and Mrs. Sessions were executed pursuant to a contract?

There was absolutely no extrinsic parol evidence tending to prove such a contract. No one testified to any admissions made by Mrs. Sessions that would prove a contract. She testified, but she was not even asked whether she made such an agremeent.

Mr. Critchfield drew the two wills, and all he said was expressed in a few sentences. He said: "I recollect of Mr. and Mrs. Sessions being present and talking over some dispositions that were to be put in her will, but just what all were I wouldn't undertake to say." Then he particularized the disposition as one that "should be made of certain things belonging to Mrs. Sessions in her will."

There is not a word or syllable in these statements indicating in the remotest degree that they had made a contract that each should give portions of his and her estate to the Academy of Art.

On the face of the wills there is, it must be conceded, by a fair mind, some evidence of such a contract, and I will briefly particularize it.

In his will Mr. Sessions devised the four parcels of real estate belonging to Mrs. Sessions, and before named, to the plaintiffs as trustees, and directed them to convey them to the Academy of Art, after it should be incorporated and organized.

Some reflections of a denunciatory character were indulged in against Mr. Sessions for making this disposition of property that did not belong to him. But he evidently made it on the hypothesis that he would survive his wife, and that she would devise the property to him. We are not enlightened as to whether this was built upon a mere hope, or upon the will she had already, five years before that, executed; probably the latter was the true basis.

Next Mrs. Sessions made a disposition of these same parcels of real estate, by which they were given to two of the same trustees, and by which they were directed to convey it to the Academy of Art, when it should be incorporated and organized, "as provided for in the last will and testament of said Francis C. Sessions, or as may be provided for."

Great value and weight were attached to the words just quoted, "or as may be so provided for," the insistence being that they infallibly proved an agreement to license Sessions to alter his will, then executed, at his pleasure. Unquestionably Mrs. Sessions intended that the academy should be provided for, by her husband's will, concurrently executed.

And the succeeding words "or as may be so provided for," undoubtedly mean that the incorporation and organization might be provided for by a subsequent will, but, not as counsel argue, a will of which she should have no knowledge and to which she should not give her consent. The undisputed evidence of Mrs. Sessions is that she knew nothing of the last will until it was read to her and after her husband's death.

Just as the preceding clause, "as provided for in the last will and testament of said Francis C. Sessions," meant the will he then and there executed, and to which she consented, if the theory of the executors is sound, so the succeeding clause meant a future will to be executed by him, and to which she should give her consent. The clause could not signify a will that he might execute secretly and clandestinely. It is an incredible assumption that her consent was necessary to the concurent will, but unnecessary to a future will. Her consent was of the very essence of the supposed contract.

It is an incredible supposition that they argeed that Mr. Sessions should have the prerogative to change, modify or revoke his part of the

contract, while Mrs. Sessions was to be bound to her will, like Prometheus chained to the rock.   To so understand the transaction between Mr. and Mrs. Sessions, is to impute to the former, who was presumably acting "upon principles of the nicest honor and from motives of the most respectable kind," that he either exchanged with his wife "solemn instruments without meaning", or intended, by them, to lay a snare for her deception.

But I will return to this topic in another place.

There is a sameness in the language used ,in the dispositions of both wills by which the four parcels of Mrs. Sessions' real estate were devised to the academy that tends to show that there was some sort of a contract. "The res ipsa loquitur is of the best and most unerring species of proofs," said Mr. Hargrave.   2 Hargrave's Judicial Arguments, 278.

But the evidence tending to prove that there was no contract is more than sufficient to countervail this evidence.

At the same time Mrs. Sessions executed her will Mr. Sessions executed a will.   Five years after that he revoked that will and made the one ,which is on exhibit here and under which the executors are now acting, and which the court is asked to construe.   If this one were identical with the one executed before, there would be some plausibility in the argument that the want of concurrence in time is of no force or value.   The first was not in evidence, nor was its draftsman able to recall all its contents.   It is true the undisputed evidence discloses that the disposition for the Academy of Art was exactly the same in both wills, except that two of the trustees were changed.   But that fact in itself is enough to annihilate theory of a contract.

If the contract was made before, or at the time, the two wills were executed in March, 1885, one of its terms was that the trusteesshould be the persons who were then named in Sessions' will.

The minds of Mr. and Mrs. Sessions met and agreed upon that term. Whence did Mr. Sessions derive the right and power to change that term of the contract by a subsequent will?   He thereby broke the contract.   It is a pregnant fact to show that there was no contract; that there was no intention that neither should not have the liberty to repent and retract the will that was made by that person.   It is Mr. Sessions' own admission of that fact.   The personnel of the trustees was not a trivial matter; it was of the very essence of the contract

Again, by Mr Critchfield's evidence, it was. shown that several other changes were made in the will of 1885, by this last one.   It is true they did not concern the Academy of Art.   But, if the mutuality and reciprocity must run through, pervade' the whole of both wills, and each and every part thereof, as authoritative precept teaches, these changes drove out all of the mutuality and reciprorcity there was in the contract.

There is another species of evidence that, in my judgment, utterly demolishes the claim that there was a contract.

Mrs. Sessions was called, and testified that when the wills of 1885 were executed, Mr. Sessions observed that they were only "temporary."   I do not agree that her testimony proves that they were only to take effect ·in case they failed to return from the Alaska trip, because she was unable to recall anything that was said by Mr. Sessions to that effect.   But he did say, according to her testimony, that the wills were only "temporary."   It is true that she was not very positive in her statements as to what occurred or was said, nor was she circumstantial.   But she could not reasonably be expected to be precise and able to identify all that was said.   It is an indication of sincerity and truthfulness.   Besides she was not contradicted by Mr. Critchfield, who was the only other now living

person that was present.   If these wills were to be temporary, they were not intended to be irrevocable.   These were cross purposes, irreconcilable with each other.

The imperative equitable rule is that the plaintiff in a case for specific performance must make out his case by clear and satisfactory proof.

The evidence in this case, considered either distributively or collectively, fails to convince me that a contract was entered into by and between Mr. and Mrs. Sessions.

There is another reason why this court will decline to decree for specific execution of the alleged contract by Mrs. Sessions.

Courts of equity, in all cases where the extraordinary remedies of injunction, specific performance and the like are applied for, are especially vigilant in the enforcement of the maxim, "He who comes into equity must come with clean hands."   An unfair or unconscionable bargain will not be enforced.   The conduct of the plaintiff, preliminary to the litigation, will be rigorously scrutinized.

It is, as has been observed before, claimed by the executors that the clause in Mrs. Sessions' will, "as may be so provided for," signifies that the incorporation and organization of the Academy of Art might be provided for in a subsequent will of Mr. Sessions, without her knowledge and consent.   If that be so, it made the alleged contract an unfair one.

The facts of the situation verify this criticism.   Assuming that there was a contract, Mrs. Sessions was to furnish $318,000 for the academy. Mr. Sessions was to furnish $53,000, exclusive of the books, paintings, etc., which were certainly not worth over $25,000.   Mrs. Sessions was to furnish more than $2 for every $1 furnished by Mr. Sessions.

He was licensed to change, modify or even revoke his will, but her's was to be unalterable, irrevocable.   He was licensed to decrease the amount that he should give the academy, or to change the personnel of the trustees, as he did; but she was not allowed to reduce the amount she had agreed to give, no matter what changes or vicissitudes might take place in her fortune.   He had liberty; she had restraint.   Such an arrangement was destitute of common fairness.   It was not only lacking in mutuality and reciprocity; it had opportunity for unilateral deception and overreaching.

To this, it might be suggested, that Mrs. Sessions relied upon the good faith, and had confidence and trust in the integrity, of her husband. But such a consideration cannot control in this case.   The executors stand, and insist, upon the enforcement of a contract.   It is a cold, colorless contract, and questions of trust and confidence are foreign to the determination of what was in the contract.

In Walpole v. Oxford, 3 Vesey's jr., 402, I find a precedent for denying the decree on this ground.   The court observed that the agreement "was not a fair agreement, and not consistent with the honor of the parties," and that unless such contracts were fair the court "will not execute them."

The corollary of these conclusions is that Mrs. Sessions was authorized to revoke her will, as she did.

On the next important question I yield my assent to the contention of the executors that there will be no failure of the purpose of Mr. Sessions to establish an Academy of Art, merely because the property of Mrs. Sessions will not be devoted to the promotion of that purpose; nor will the devise of the homestead, furniture, etc., to the academy lapse for that reason.

It is true the academy will not receive as much financial aid as he

may have contemplated; that is all. That, as counsel for the executors argued, is only a failure of means, and not of purpose.

In the third item of his will, Mr. Sessions devises and bequeaths his homestead, furniture, etc., in case his wife should not dispose of them, to the plaintiffs as trustees, who are commanded to convey them to the academy after it should be incorporated and organized. Next he provides for its incorporation and organization, outlines its purposes and objects, authorizes the erection of such additional building or buildings as may be found necessary, designates the incorporators and trustees, provides for their succession, suggests what some of the provisions of the corporate articles shall be, expresses a desire that certain pupils shall not be required to pay tuition, directs that a portion of the fund provided in the will shall be expended in buying paintings, etc. and declares that if his "objects and purpose cannot be carried out and given full effect in the precise manner I may herein specify, I wish them to be carried out in substance and given full effect in such manner as may be practicable and lawful;" and to achieve this end he authorized the executors "to do "whatever may be necessary or convenient to carry out and give full effect to my said objects and purposes, and to my intention in regard to the same."

Then the devise of the four parcels of real estate belonging to Mrs. Sessions, follows in the same item.

Trusts only fail altogether, when vice or unlawfulness permeates the entire scheme so effectually that no part of it can be saved and preserved.

Frequently dispositions of property are upheld upon a certain event, when, at the same time, void alternative dispositions are discarded as void. It is the duty of courts to nourish and support every scheme of trust, or executory limitation, unless the plain desires and purposes of the grantor or testator will thereby be subverted. The settled test is, will the fostering and shoring up of one part of the scheme, and the elimination and rejection of the other part overthrow the wishes of the grantor or testator? Will giving effect to the one part and refusing countenance to the other, in a certain contingency, be inconsistent with his intent?

In Darling v. Rogers, 22 Wendell, 495, the dominant rule is thus stated:

"When a will is good in part and bad in part, the part otherwise valid is void, if it works such a distribution of the estate as, from the whole testament taken together, was evidently never the design of the testator."

Again, in the celebrated Tilden case, the highest court of New York, adverting to this rule, that where several trusts are created by a will, which are independent of each other, and each complete in itself, some being legal and some illegal, the illegal may be cut off and the legal may stand, said:

"This rule can only be applied in aid and assistance of the manifest intent of the testator, and never where it would lead to a result contrary to the purpose of the will, or work injustice among the beneficiaries, or defeat the testator's scheme for the disposal of his property. The rule as applied in all reported cases, recognizes this limitation, that, when some of the trusts in a will are legal and some illegal, if these are so connected together as to constitute an entire scheme, so that the presumed wishes of the testator would be defeated if one portion was retained and others rejected, or if manifest injustice would result from such construction to the beneficiaries, or some of them, then all the trusts must be construed together, and all must be held illegal, and must fall."

Tilden v. Green, 130 N. Y. 0; 28 N. E. 880.

This rule was also explained and applied in Benedict v. Webb, 98 N. Y. 460.

The primary intention of Mr. Sessions was the erection of an Academy of Art and the endowment of it with some of his own property. The gift of his valuable paintings and statuary was doubtless a considerable part of that intention. True he gave Mrs. Sessions the liberty of selling all of it, thereby putting it in her power to defeat the whole scheme so far as his property entered into it. But the addition of that power did not enlarge her life estate into a fee-simple. There is an increasing tendency among courts to put a limitation on such powers of disposition when they are annexed to a life estate, and to construe them to mean that they can only be used to enable the life tenant to enjoy the life estate or to appoint the remainder, as a separate interest, to some third person or persons.

In any event, should not the contingency of Mrs. Sessions' disposing of the property happen, the purpose of Mr. Sessions that the property should go to the academy was just as pronounced and masterful as if that power had not been added to her life estate.

From a consideration of the dispositions of his will, and a careful search for his purposes, I am not convinced that he contemplated that the academy should fail in the event that Mrs. Sessions' property was not devoted to it. There is no such dependence between them that, if one fails, the other must keep it company. That part of his will which disposes of her property for that purpose, may be separated from the rest of item 3; it may be rejected while the rest may be upheld. That course will not defeat his presumed wishes. The contrary course would, in my judgment, be inconsistent with his testamentary purposes relative to the Academy of Art. Kennedy v. Hoy, 11 N. E. 390; Cross v. Trust Co., 30 N. E. 125; Underwood v. Curtis, 28 N. E. 585; Woodgate v. Fleet, 64 N. Y. 566.

Technically, that part of his will which disposes of Mrs. Sessions' porperty for the academy, is not to be rejected. The property will not be applied to that purpose, because he had no right to devote it to that purpose; and because the owner of the property asserts her own unchallengable ownership and control over it. As property of the testator it does not exist.

Suppose A should by one item of his will give B $100, and by another item $200; and suppose his assets should be sufficient to pay only one of the legacies. That legacy would not lapse merely because the money to pay the other did not exist.

The effect of this conclusion will be that the homestead and the furniture, paintings, etc., except such as were given to her by the compromise, after Mrs. Sessions' death, will go to the Academy of Art.

The next question is, can any more of Mr. Sessions' estate be used by the executors to cherish and aid the Academy of Art, under what I have called the elastic provision of his will, and which was quoted in the discussion of the preceding question?

The rest of the estate has been estimated at $62,300. About $35,000 was bequeathed to specific legacies, leaving $25,800, less debts and expenses, to fall under the residuary provision to the First Congregational church, if the executors are not empowered to use it, in their discretion, to befriend and aid the academy.

One of the characteristics of a charitable trust is the "generality, indefiniteness and even uncertainty which is permitted in describing the objects and purposes, or benecifiaries." In this respect it differs from an ordinary trust.

But, just like an ordinary trust, the declaration of a charitable trust must be reasonably certain in the statement or description of the property embraced in the trust. There must be a definite subject; that is, the

property must be definitely defined and described. When the language used to define or describe it is "vague, general or equivocal," there is a miscarriage of the trust. The provision in Mr. Sessions' will, by which the executors are empowered "to do whatever may be necessary or convenient to carry out and give full effect to my objects and purposes and to my intention" in regard to the academy, is too "vague, general and equivocal" to authorize them to use any part of his estate, not specifically devoted to that end, to promote and support the academy; and so is the language of the provision which authorizes them to erect such additional building or buildings "as may be found necessary or convenient."

Putting the strongest construction on these provisions in favor of the academy, it means that the testator declared that he devoted a blank amount of his property to found, aid, perpetuate and sustain an institution of learning.

He did not specify how much of his estate should be so used. His will does not furnish the means of ascertaining the exact amount through the delegated discretion of the executors, or in any other way.

His intention sought to be drawn from the elastic provision was indefinite and unexpressed. It was to take a determinate form and expression only when the executors exercised their discretion. But, as I have said, this provision does not, nor does any other provision of the will, furnish the means of ascertaining the amount of the property to be devoted to the object.

The testator should have expressed and entertained a determined view as to the amount of expenditure and investment necessary to establish and maintain the institution.

It seems clear that in this elastic provision there is a hopeless and fatal uncertainty as to the subject of the bequest and devise; it is a legal uncertainty which could not have been even cured by the law of charities in England.

It does not seem needful to hunt up authorities to support these propositions. I recall an old one, the case of Williams v. Kershaw, 5 Cl. & Fin. 111, in which it was decided that a "direction by a testator to his trustees to apply the residue of his personal property to and for such benevolent, charitable and religious purposes as they, in their discretion, should think most advantageous and beneficial, and for no other use, intent, or purpose," was void for uncertainty.

See also, not as direct authorities, but as cases throwing some light on the question: Chapman v. Brown, 6 Ves. 409; Att'y Gen. v. Davis, 9 Id. 535; Lunby v. Gurr, 6 Modd. Ch. 151; Att'y Gen. v. Hinxman, 1 Jac. & Walker, 270.

The slippery rule, cy pres, cannot be invoked to invest the executors with such power; (1) because it can only be applied to save a charitable trust from the result of uncertainty as to its objects and purposes, beneficiaries and trustee; and (2) because this rule of construction is repudiated in Ohio.

It is doubtful whether any English case can be discovered in which even prerogative would undertake to declare how much of an estate should be appropriated to found and maintain a charity, where there were no means of ascertaining from the will how much the testator intended to give.

In the most extreme cases, the English courts never gave effect to a gift which was void in law for indefiniteness, *as to the subject of the gift.* Charitable trusts were sustained where no trustee was appointed, and when the beneficiaries were an indefinite class of persons, and when they collided with the rule against perpetuities. These cases furnished occasions for

the exercise of the cy pres power by which an approximate or discretionary will was made for the testator; but it was never exercised where the charitable intention was indefinite and the subject was indefinite.

Such trusts were not enforcible by judicial sentences. Besides it must be remembered that the cy pres power, whether it was exercised by the court of chancery through a master, or by the crown, rested upon prerogative—a foundation for the power not in harmony with our institutions.

Mills v. Farmer, 1 Mer. 55, 96; Pocock v. Attorney General, 3 Ch. Div. 342; Att'y Gen. v. Duke of Northumberland, 7 Ch. Div. 745; Gillam v. Taylor, L. R. 16 Eq. 581; Isaac v. Defriez, Amb. 595.

Leovers v. Clayton, 8 Ch. Div. 584: Aston v. Wood, L. R. 6 Eq. 419.

I perceive no way by which these two provisions of the will to which I have referred can be delivered from the uncertainty that makes them void.

Hence, it must be concluded that all of Mr. Sessions' estate, except the fee in the homestead, such of the paintings, statuary, etc., as were not yielded to Mrs. Sessions by the compromise, such of the $30,000 as was given to Albery & Sessions, and the $35,500 which are necessary to pay the pecuniary legacies, must belong to the First Congregational church as residuary devisee and legatee, the amount being $25,800, or about $20,000 after payment of debts and expenses, according to the estimate of the executors.

From this opinion counsel will probably be able to draft a decree, except on one point.

It is the duty of the executors to have the Academy of Art incorporated, etc., and, although the corporation cannot be invested with the possession of the property till after Mrs. Session's death, yet, as the settlement of the estate should not be delayed so long, thereby increasing the expense, the executors may be ordered to discharge that duty within a short time.

Counsel for the church emphasized the point that the devise and bequest were to an unincorporated institution. That does not render the trust void for uncertainty—a proposition of law which our Supreme Court, in Williams v. First Presbyterian Church, 1 Ohio St. 478, announced.

A decree conforming to this opinion may be drawn.

Our circuit court decided a mutual will case in Madison county, but this case is not controlled by the decision in that case. There the existence and terms of the contract were conclusively proved by extrinsic evidence. The draftsman of the will testified that Mrs. Pancake said that "she was willing to make a will devising all the property to him, if he (her husband) would make a will at the same time devising the property which he should receive from her to her brother John, or his heirs, at the death of the doctor, and thereupon they both agreed to that, and I prepared the will."

This testimony was not disputed, and it conclusively established both the existence and terms of the contract.

L. J. Critchfield, for Plaintiffs.

J. T. Holmes and J. M. Pugh, for Mrs. Sessions.

S. N. Owen, for Trustees of the Church.

C. O. Hunter, for F. M Sessions; and

F. F. D. Albery, for W. H. Albery.